# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | | |
|---|---|---|
| **RENEE HENSON,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | **CIVIL ACTION FILE NO.** |
| **v.** | : | **1:09-cv-1759- AJB** |
| | : | |
| **MICHAEL J. ASTRUE,** | : | |
| *Commissioner of Social* | : | |
| *Security Administration*, | : | |
| | : | |
| **Defendant.** | : | |

## <u>ORDER AND OPINION</u>[1]

Plaintiff Renee Henson ("Plaintiff") brought this action pursuant to sections 205(g) and 1631(c)(3) of the Social Security Act, 42 U.S.C. §§ 405(g), 1383(c)(3), to obtain judicial review of the final decision of the Commissioner of the Social Security Administration ("the Commissioner") denying her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income Benefits ("SSI") under the Social Security Act ("the Act").[2]  For the reasons stated below, the undersigned **REVERSES**

---

[1]     The parties have consented to the exercise of jurisdiction by the undersigned pursuant to 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73.  [*See* Dkt. Entries dated 4/26/2010].  Therefore, this Order constitutes a final Order of the Court.

[2]     Title II of the Social Security Act provides for federal disability insurance benefits.  42 U.S.C. § 401 *et seq*.  Title XVI of the Social Security Act, 42 U.S.C. § 1381, *et seq*., provides for supplemental security income benefits for the

the final decision of the Commissioner **AND REMANDS** the case to the Commissioner for further proceedings consistent with this opinion.

## I.       PROCEDURAL HISTORY

Plaintiff previously received disability benefits between 1996 and July 31, 2002. [R153]. Following the termination of these disability benefits, Plaintiff filed applications for DIB and SSI on August 24, 2004, alleging disability commencing on January 31, 1996. [Record (hereinafter "R") 650-653]. Plaintiff subsequently filed applications for DIB and SSI on August 18, 2005, and June 7, 2007, [R64-65A, 66-67], because the paperwork kept getting lost, [*see* Doc. 15 at 6]. Plaintiff's applications were denied initially and on reconsideration. [*See* R27-28, 30-33, 40-43, 654-58, 663-67]. Plaintiff then requested a hearing before an Administrative Law Judge ("ALJ").

---

disabled. Title XVI claims are not tied to the attainment of a particular period of insurance disability. *Baxter v. Schweiker*, 538 F. Supp. 343, 350 (N.D. Ga. 1982). The relevant law and regulations governing the determination of disability under a claim for DIB are nearly identical to those governing the determination under a claim for SSI. *Wind v. Barnhart*, 133 Fed. Appx. 684, 690 n.4 (11th Cir. 2005) (citing *McDaniel v. Bowen*, 800 F.2d 1026, 1031 n.4 (11th Cir. 1986)). Under 42 U.S.C. § 1383(c)(3), the judicial provisions of 42 U.S.C. § 405(g) are fully applicable to claims for SSI. In general, the legal standards to be applied are the same regardless of whether a claimant seeks DIB, to establish a "period of disability," or to recover SSI. However, different statutes and regulations apply to each type of claim. Therefore, to the extent that the Court cites to SSI cases, statutes, or regulations, they are equally applicable to Plaintiff's DIB claims.

[R44].  An administrative evidentiary hearing was held on July 16, 2008.  [R668-86].

The ALJ issued a decision on September 4, 2008, denying Plaintiff's application

because she had not been under a "disability" at any time through the date of the

decision.  [R12-23].  Plaintiff sought review by the Appeals Council, and the Appeals

Council denied Plaintiff's request for review on February 26, 2009, making the ALJ's

decision the final decision of the Commissioner.  [R7-9].

Plaintiff then filed an action in this Court on May 1, 2009, seeking review of the

Commissioner's decision.  *Renee Henson v. Commissioner of Social Security*, Civil

Action File No. 1:09-cv-01759.  [*See* Doc. 2].  The answer and transcript were filed on

October 13, 2009, [*see* Docs. 8-9], and the Court heard oral arguments on April 23,

2010, [*see* Doc. 18].  The matter is now before the Court upon the administrative

record, the parties' pleadings, the parties' briefs, and the parties' oral arguments, and

is accordingly ripe for review pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

## II.    STATEMENT OF FACTS

### A.    *Administrative Records*

In a May 20, 2004, Disability Report, Plaintiff reported that she was 5 feet,

2 inches tall and weighed 380 pounds.  [R73].  Plaintiff indicated that the following

3

impairments prevented her from working: seizures,[3] torn cartilage in her knees, depression, thyroid disease, loss of feeling in her right leg, and arthritis. Plaintiff explained that her seizures were uncontrollable and that she could not walk or stand for long periods of time due to leg and knee pain. [R74]. Plaintiff was taking a number of medications, which caused side effects such as dizziness, constipation, sleepiness, fatigue, nausea, and sensitivity to light. [R79].

In a September 2004 disability report, Plaintiff indicated that seizures, torn cartilage in her knees, and social anxiety prevented her from working. [R86]. Plaintiff listed a number of medications that she was taking, noting that some medications did not have side effects while others like Zoloft (an anti-depressant)[4] caused dizziness. [R90-91].

In a September 19, 2004, Function Report, Plaintiff reported that she lived at home with family. Her daily activities included, washing up, taking medications,

———————————

[3]     Plaintiff took medication for her seizures, which reduced the frequency of the seizures from occurring daily to occurring weekly. [R113]. During the seizures, which lasted 3 to 7 minutes, Plaintiff would be in a daze, drool, and sometimes lose bladder control. [R113-14].

[4]     Unless otherwise stated, the descriptions and definitions of medications and medical terms are based on information from the Medline Plus website. *See* Medline Plus, http://medlineplus.gov/.

4

eating, sitting on the sofa, folding clothing, resting, sitting in a chair, loading dishes, napping, helping her daughter with homework, doing stretches, and reading at bedtime. [R97].  Plaintiff helped her daughter with homework and directed her daughter in preparing for baths, eating, and dressing.  Plaintiff stated that her conditions caused pain, which made it difficult to rest.  [R98].  Plaintiff reported making simple meals, but she did not make hot meals because the heat made her dizzy.  [R99].  Plaintiff did not drive or leave her home alone because of her seizures.  [R100].  Plaintiff attended church once per week and she daily would read, complete puzzles, and play cards. [R101].  Plaintiff could not be around more than five people at one time.  Her impairments prevented her from lifting more than 10 pounds, walking more than 30 feet without needing to rest, and paying attention for more than 20 minutes.  [R102]. Plaintiff would ride in a cart to traverse stores.  [R103].

In Plaintiff's February 2005 Disability Report – Appeal, Plaintiff listed taking four medications.   The Zonegran (anticonvulsant medication) caused dizziness, sleepiness, and confusion, and the Zoloft caused fatigue.  [R118].  Plaintiff reported that it was difficult for her to walk and concentrate and that she needed help with bathing, cooking, and cleaning.   [R119].   Plaintiff stated that her "seizures[,] medications and moving difficulty cause[d] more problems than you could imagine."

5

[R121].  In an August 2005 disability report, Plaintiff again noted that seizures, torn cartilage, and social anxiety prevented her from working.  [R123].  Plaintiff listed Zonegran, Ziac (high blood pressure drug), and Zoloft as causing side effects, including blurred vision, dizziness, fatigue, and light sensitivity.  [R127].

In a September 2005, Disability Report – Appeal, Plaintiff added that she had developed pain and numbness in her legs and hips along with back pain and swelling in her feet and ankles.  [R130].  Plaintiff reported that her Zonegran caused dizziness, sleepiness, and concentration problems, her Ziac caused lightheadedness, and her Zoloft caused dizziness and fatigue.  [R133].

B.    *Medical Records*

On November 6, 1997, Plaintiff went to Dr. Robert Bashuk to be evaluated for seizures, which Plaintiff described as a buzzy sensation in her head that spread to her entire body.  Dr. Bashuk noted that Plaintiff had been having syncopal (loss of consciousness) episodes for the last two or three years and that they were daily since 1997.  According to Plaintiff, these seizures had caused three car accidents.  Plaintiff had a CT scan, which was negative, and an EEG, which showed abnormal "left temporal sharp discharges with phase reversals as well as bitemporal discharges." [R430].  At this time, Plaintiff was morbidly obese.  Dr. Bashuk diagnosed Plaintiff

6

AO 72A
(Rev.8/8
2)

with complex partial seizures and prescribed Tegretol (medication used to treat seizures). [R431]. On November 25, Plaintiff was started on Depakote (medication used to treat seizures and mania in people with bipolar disorder), which gave Plaintiff a rash. [*See* R428-29]. On December 11, Plaintiff reported having "aura's" two to three times per day, and Plaintiff was taken off of Tegretol. [R428].

Dr. Marvin Rachelefsky noted on January 12, 1998, that results from a 24-hour EEG showed no seizure activity or abnormal spells. [R427]. On January 23, Plaintiff reported seizures improving, but she had occasional dizziness or shakiness on the Neurontin (anticonvulsant medication). [R426]. A February 20 note is largely illegible, but it indicates that Plaintiff was to continue with the Neurontin. [R425].

On May 8, 1998, Dr. Rachelefsky conducted another EEG, which was normal. [R424]. A June 12 medical note indicated that Plaintiff would continue on Neurontin and Gabitril (another anticonvulsant) would be added. On July 21, Plaintiff stopped the Gabitril, and she reported seizures occurring when it was hot, there was bright light, she was closed in, or she had shortness of breath. [R420]. Dr. Bashuk questioned whether Plaintiff's seizures were "pseudoseizures" because Plaintiff's EEGs were normal. He also noted that Plaintiff was morbidly obese, had 5/5 strength, and had an unremarkable

AO 72A
(Rev.8/8
2)

gain. He assessed Plaintiff with probable complex partial seizures and pseudoseizures. [R419].

On October 28, 1998, Dr. Bashuk noted that Plaintiff's seizures had improved "but they certainly do continue." The seizures were caused by stress and other discomfort. Dr. Bashuk diagnosed Plaintiff with complex partial seizures and/or pseudoseizures along with headaches. He increased Plaintiff's daily Neurontin dosage. [R417].

On January 29, 1999, Plaintiff weighted 382 pounds. Plaintiff and her mother visited Dr. Bashuk on this date. Plaintiff's mother reported that Plaintiff was moody and difficult to live with. Plaintiff's seizures were precipitated by emotional factors. [R414]. Dr. Bashuk assessed Plaintiff with muscle contraction/vascular headaches and "[r]ecurrent seizures verses pseudoseizures with poor control with Neurontin if these are actually seizures." [R414].

Dr. Bashuk saw Plaintiff on June 1, 1999, who indicated that she had frequent headaches and did not recall the last time she had a seizure. Plaintiff was assessed with complex partial seizures or pseudoseizures and muscle contraction headaches. Dr. Bashuk indicated that he would try Plaintiff on Ativan (anti-anxiety medication) and Axocet (pain reliever for mild to moderate pain) for headaches. [R408].

8

Following a referral, Plaintiff was seen by Dr. Rafael Urrutia at Resurgens Orthopaedics ("Resurgens") for right knee pain.  Dr. Urrutia indicated that Plaintiff's knee was essentially normal except for some patellofemoral crepitus (grating or crackling sound or sensation).  He gave Plaintiff an injection, which provided some relief.  [R435].  On January 10, 2000, Dr. Scott Kleiman at Resurgens prescribed Celebrex (medication to relieve pain, tenderness, swelling, and stiffness) because of discomfort in Plaintiff's right knee.  [R434].

Plaintiff returned to Dr. Bashuk on January 11, 2000, indicating that her seizures were more frequent if she was hot or in pain.  Plaintiff was assessed with seizures or pseudoseizures.  She was to try Buspar (anti-anxiety medication), continue Neurontin, and discontinue Ativan.  [R407].  Plaintiff returned to Dr. Bashuk on May 4, and reported having no seizures in one month.  Plaintiff indicated that the Buspar was working well and she felt calm.  Plaintiff was assessed with obesity and seizure disorder vs. pseudoseizures.  Her Buspar was increased and her Neurontin was decreased.  [R405].

On June 23, 2000, Dr. Urrutia injected Plaintiff's knee to resolve a re-exacerbation of an injury.  [R433].

9

On March 20, 2001, Plaintiff visited Dr. Sharon Tuckett for a follow up and refills for Ziac, Synthroid (thyroid hormone to treat hypothyroidism[5]), and Zoloft. Plaintiff was diagnosed with: skin lesion and lip swelling; headache; stable hypertension; and exogenous obesity. [R233].

On July 24, 2002, Dr. Tuckett reported that Plaintiff had been incarcerated for 18 months and was released in June. Plaintiff was living with 11 other people, which she found stressful. Plaintiff reported having three seizures in the prior 8 months and that she had them more frequently on medication. Plaintiff complained of headaches with sharp pain that occurred in the evening. [R231]. Plaintiff was diagnosed with a history of: seizures, anxiety dysthymia, and hypothyroidism. [R232].

Dr. Tuckett saw Plaintiff on November 12, 2002, for daily headaches. [R229]. Plaintiff was diagnosed with: sinusitis; persistent headache of unclear etiology; history of hypothyroidism, for which Dr. Tuckett resumed Synthroid; history of anxiety; and history of hypertension, which was stable; and lower back pain. [R229-30].

Plaintiff went to Dr. Bashuk's office on November 2002 and explained her long absence as being a result of her 13-month prison term. Plaintiff reported having severe

---

[5]    Hypothyroidism is a condition in which the thyroid gland is not active enough, causing an individual to gain weight, feel fatigued, and have difficulty with cold temperatures.

10

seizures in prison.  She was assessed with seizure disorder, muscle contraction headaches/migraines, and morbid obesity.  [R403].

On July 19, 2002, Dr. Jay Watkins completed a Treatment Request and Integrated Georgia Reporting Survey form, indicating that Plaintiff had: (1) major depressive disorder, recurrent, in full remission and social phobia on Axis I; (2) no diagnosis on Axis II; and (3) a GAF of 75 on Axis V,[6] which was the highest GAF in

_____

[6]     The GAF (Global Assessment of Functioning) rates an individual's overall level of psychological, social, and occupational functioning. *Lozado v. Barnhart*, 331 F. Supp. 2d 325, 330 n.2 (E.D. Pa. 2004) (citing *Diagnostic and Statistical Manual of Mental Disorders* (4th Ed.) ("DSM-IV" at 32)).  The GAF ranges:

from 0 to 100 and is divided into 10 ranges of functioning, requiring the examiner to pick a value that best reflects the individual's overall level of functioning using either symptom severity or functioning. . . . Each range can be described as follows: a GAF score in the range 31-40 indicates "some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas such as work, school, family relations, judgment, thinking or mood;" a GAF score of in the range of 41-50 indicates "serious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g. no friends, unable to keep a job);" a GAF score in the range of 51-60 indicates "moderate symptoms (e.g. flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g. few friends, conflicts with peers or coworkers);" a GAF score in the range of 61-70 indicates "some mild symptoms (e.g. depressed mood and mild insomnia) OR some difficulty in social, occupational or school functioning (e.g. occasional truancy or theft within the household), but generally functioning pretty well, has

11

the past 12 months.[7]  [R337, 627].  Plaintiff's depressed mood was determined to be

> some meaningful interpersonal relationships;" a GAF score in the range
> of 71-80 indicates, "if symptoms are present, they are transient and an
> expectable reaction psychosocial stressors (e.g., difficulty concentrating
> after family argument; no more than slight impairment in social,
> occupational, or school functioning (e.g., temporarily falling behind in
> schoolwork))." [ ].

*Lozado*, 331 F. Supp. 2d at 330 n.2 (internal citations omitted) (citing DSM-IV at 32,
34).

[7]      According to the chapter on "Multiaxial Assessment" in *Diagnostic and
Statistical Manual of Mental Disorders*, DSM-IV-TR (4th ed. 2000):

> A multiaxial system involves an assessment on several axes, each of
> which refers to a different domain of information that may help the
> clinician plan treatment and predict outcome.  There are five axes included
> in the DSM-IV multiaxial classification:
>
> > Axis I:  Clinical Disorders, Other Conditions That May Be
> > a Focus of Clinical Attention
> > Axis II:  Personality Disorders, Mental Retardation
> > Axis III:  General Medical Conditions
> > Axis IV:  Psychosocial and Environmental Problems
> > Axis V:  Global Assessment of Functioning
>
> The use of the multiaxial system facilitates comprehensive and
> systematic evaluation with attention to the various mental disorders and
> general medical conditions, psychosocial and environmental problems,
> and level of functioning that might be overlooked if the focus were on
> assessing a single presenting problem. A multiaxial system provides a
> convenient format for organizing and communicating clinical information,
> for capturing the complexity of clinical situations, and for describing the
> heterogeneity of individuals presenting with the same diagnosis.  In

12

stable.  [R338].

Dr. Jay Watkins completed a Treatment Request and Integrated Georgia Reporting Survey form in March 2003, providing the following diagnosis: (1) major depressive disorder, recurrent, full remission and social phobia on Axis I; (2) no diagnosis on Axis II; (3) deferred on Axis III; and (4) a GAF of 70 on Axis V with the highest GAF of 75 in the past year.  [R331].  As of March 2003, Dr. Watkins determined that Plaintiff's depressed mood was stable and she had no anxiety/panic attacks.  [R332].

Plaintiff was referred to Dr. Raj Bansal on February 13, 2004, while she was pregnant because of seizure disorder, hypothyroidism, and morbid obesity.  [R213]. Dr. Bansal was not able to weigh Plaintiff because his scale only went up to 350 pounds, but Plaintiff estimated her weight to be 399 pounds.  [R211, 213].  Dr. Bansal recommended that Plaintiff stay on her seizure medications - - Neurontin and Topamax - - despite having limited information about the drugs in pregnancy.  [R211, 213]. Plaintiff reported not having a seizure in two months.  [R210].

_____

addition, the multiaxial system promotes the application of the biopsychosocial model in clinical, educational, and research settings.

*Diagnostic and Statistical Manual of Mental Disorders* ("DSM-IV-TR") (4th ed. 2000) at 27.

AO 72A
(Rev.8/8
2)

On February 19, 2004, Plaintiff went to Dr. Bashuk who diagnosed Plaintiff with seizure disorder, migraines, and pregnancy.  Plaintiff indicated that she was not able to tolerate Topamax.  [R401].

Dr. Bansal indicated on March 4, 2004, that he spoke with Plaintiff's neurologist, Dr. Bashuk, who reported that Plaintiff was very difficult and might not really have a seizure disorder.   [R208].   An April 6 note indicated that Plaintiff had been noncompliant because she had missed appointments.  Plaintiff was diagnosed on April 6 with being pregnant with epilepsy (although she was doing well off her medications); hypothyroidism; possible hypertension; and obesity.  [R206].  An April 29, 2004, note indicated that Plaintiff appeared to be doing well off her seizure medication.  [R204].  A June 10, 2004, exam with Dr. Bansal was significant for low amniotic fluid.  Plaintiff did not report any recent seizures.  [R201].  On July 13, Dr. Bansal reported that Plaintiff had been very noncompliant, but there were no abnormalities in a fetal survey.  [R196-97].  On July 26, 2004, Plaintiff was admitted to the hospital for a cesarean section and bilateral tubal ligation, and she was discharged on July 19.  [*See* R173-79].

14

Plaintiff went to Dr. Bashuk on September 22, 2004, where she reported having seizures at least twice per day.  Plaintiff was diagnosed with seizure disorder and morbid obesity.  Plaintiff was prescribed Lorazepam (anti-anxiety medication). [R399].

On October 26, 2004, Plaintiff was seen at the Wellstar Douglasville Medical Center where she complained of headaches and knee and back pain.  A review of Plaintiff's systems noted that Plaintiff had fatigue, anxiety, depression, pain, stiffness, obesity, and tenderness in her knees and back.  [R222].  Plaintiff was assessed with: right leg pain and swelling; right knee pain; anxiety; and depression.  [R223].

On October 29, 2004, Rebecca Blakeman, Ph.D., performed a psychological evaluation of Plaintiff.  [R234-37].  Plaintiff reported working at Burger King for two months in 2003, but she left because of significant social anxiety.  Plaintiff also indicated that her anxiety interfered with her going to the store, attending church, and being around people. [R234].  Plaintiff indicated that she lived with her mother, sister, two nieces, and two children.  Plaintiff did not drive because of her seizures, but Plaintiff was able to care for her infant child.  Plaintiff also ensured that her daughter was up and ready for school.  During the day, Plaintiff stayed in a friend's hotel room because her mother watched 8 children at home, which was too stressful for Plaintiff. [R235].

15

At the time of the evaluation, Plaintiff was 31 years old, stood 5 feet, 3 inches tall, and weighed 435 pounds.  [R235].  Blakeman diagnosed Plaintiff on Axis I with dysthymic disorder and social phobia with panic.  Blakeman noted that Plaintiff's morbid obesity was a factor in her social phobia since she perceived people as staring at and talking about her.  Blakeman found that Plaintiff had poor insight into the influence that her anxiety and depression played in her social functioning.  [R236]. Blakeman concluded that Plaintiff would "not likely" be able to maintain gainful employment because her anxiety would impede her ability to show up for work, learn skills, and persevere under stress.  [R236-37].  Blakeman determined that Plaintiff cognitively could learn simple to moderately difficult job tasks, but that her performance would suffer around too many people.  Blakeman gave Plaintiff a "fair" prognosis, but noted that without treatment, Plaintiff's condition would worsen over time.  [R237].

On November 22, 2004, Dr. Charles Scott performed a consultative examination. [R238-42].  Dr. Scott noted that Plaintiff had a history of seizure disorder, chronic lumbar strain, and morbid obesity, but that Plaintiff was also a fair to poor historian. Plaintiff reported having approximately eight seizures per month, which were triggered

16

by anxiety.  [R238].  Plaintiff reported having lumbar pain of 7-8 out of 10 since a 1995

motor vehicle accident, but that she did not take analgesics.  [R238-39].

At the time of the examination, Plaintiff weighed over 350 pounds.  Dr. Scott

found Plaintiff to be oriented, alert, and cooperative and not to have difficulties with

concentration, mental confusion, or hyperactivity.  Plaintiff's gait was unremarkable,

and she was able to stand and walk independently and without difficulty.  [R240].

Dr. Scott gave the following clinical impressions.  Concerning the chronic

lumbar strain, Dr. Scott noted that Plaintiff was morbidly obese and had questionable

range of motion in the left lower extremity.  There was no evidence of radiculopathy

(condition of the nerve root), and Dr. Scott believed that conservative measures such

as rest, cold, and analgesics might help.  As for the seizure disorder, Dr. Scott noted

that an updated neurological evaluation was needed.  [R241].

Dr. Scott indicated that Plaintiff needed patient education, lifestyle changes, risk

factor reduction, and a supervised progressive exercise program to improve her quality

of life.  Dr. Scott also believed that Plaintiff would have problems with prolonged

standing, walking, bending, and crouching, but she did not appear to have a problem

with lifting.  Dr. Scott also noted that Plaintiff did not appear to have a problem with

remembering, maintaining concentration and attention to tasks, following simple or

17

AO 72A
(Rev.8/8
2)

complex instructions, and adhering to a work schedule.  Dr. Scott indicated that Plaintiff's long term prognosis depended on significant weight loss, the natural progression of her impairments, adherence to a medical program, and results of consultative exams.  Dr. Scott indicated that Plaintiff should use an antidepressant because there was a component of chronic dysthymic disorder.  [R242].

On November 8, 2004, Janet Telford-Tyler, Ph.D., completed a Mental Residual Functional Capacity Assessment, which indicated that Plaintiff was moderately limited in the ability to: (1) carry out detailed instructions; (2) maintain attention and concentration for extended periods; (3) perform activities within a schedule, maintain regular attendance, and be punctual; (4) complete a normal workday or work week; (5) interact appropriately with the general public; and (6) get along with coworkers or peers.  [R243-44].  Based on these findings, Telford-Tyler made the following functional capacity assessment: (1) ability to understand and remember simple tasks, but episodic difficulty with detailed tasks; (2) ability to maintain basic attention and concentration for simple tasks, but episodic difficult to sustain concentration; (3) episodic interruptions to a normal workweek secondary to psychologically based symptoms, which is not a substantial limitation; (4) intact social skills with episodic difficulty dealing with the general public; and (5) intact adaptation skills.  [R245].

18

Telford-Tyler's Psychiatric Review Technique indicated that Plaintiff had social anxiety, [R248, 253], and that Plaintiff had mild restrictions in activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace, [R258].

On December 27, 2004, Dr. Marcia Turner completed a Physical Residual Functional Capacity Assessment. [R263-70]. Dr. Turner found that Plaintiff could: (1) occasionally lift and/or carry 20 pounds; (2) frequently lift and/or carry 10 pounds; (3) sit, stand and/or walk for 6 hours in an 8-hour day; and (4) push and/or pull without limitations. [R264]. Dr. Turner indicated that Plaintiff: (1) never could climb ladder/ropes/scaffolds; but (2) occasionally could climb ramp/stairs, balance, stoop, kneel, crouch, crawl. [R265]. Dr. Turner believed that Plaintiff should avoid hazards such as heights and machinery due to Plaintiff's seizure disorder. [R267].

Blakeman performed a second psychological evaluation of Plaintiff on March 8, 2006. [R317-19]. At this evaluation, Plaintiff reported being depressed, crying on a daily basis, and avoiding stores due to anxiety. [R317]. Plaintiff also indicated that she had seizures on a daily basis in which she went into a daze for five minutes and felt confused after the seizures. Plaintiff was 430 pounds at the time of the evaluation. Her mood was depressed, but she was cooperative and pleasant. Blakeman diagnosed

19

Plaintiff on Axis I with major depressive disorder, chronic, mild to moderate, and social phobia with panic.  Since Plaintiff had moderately impaired psychological functioning, Blakeman believed that Plaintiff would have significant difficulties obtaining and maintaining gainful employment with anxiety impeding her attendance, ability to concentrate, and ability to perform job duties.  Also, Blakeman determined that Plaintiff's mood would likely lead her to struggle with production norms and cause problems interacting with co-workers.  Plaintiff's prognosis was fair, but Blakeman believed that Plaintiff would respond well to therapy if she was compliant.  [R319].

Plaintiff went to Dr. Bashuk on February 14, 2006, who diagnosed Plaintiff with seizure disorder"?" and morbid obesity.  Plaintiff was prescribed Tegretol.  [R397].

On March 2, 2006, Dr. Jay Watkins completed a Treatment Request and Integrated Reporting Survey, finding that Plaintiff's current GAF was 35 and her highest for the past year was 60.  Plaintiff was diagnosed on Axis I with major depressive disorder, recurrent, moderate, and panic disorder with agoraphobia. [R324]. Plaintiff had moderate/frequent depressed mood, feelings of worthlessness, and anxiety/panic attacks.  She also had mild/infrequent change in appetite, change in energy level, and sleep disturbance.  [R325].

20

On March 21, 2006, Dr. Edward Ajayi with the Douglas County Community Service Board diagnosed Plaintiff with major depressive disorder because she could not think straight, cried for no reason, had no energy, was irritable, and felt hopeless and worthless.  Plaintiff was alert, kempt, tense, and anxious with an irritable mood and affect. Plaintiff's thinking was disorganized and irrational, and her thought process was repetitive.  Plaintiff's concentration was impaired and her attention easily shifted. [R321, 647].

Linda O'Neil, Ph.D., completed a Psychiatric Review Technique form on March 22 and April 27, 2006, indicating that Plaintiff had affective and anxiety-related disorders in the form of mild to moderate major depressive disorder and social phobia with panic.  [R352, 355, 357, 370].  O'Neil determined that Plaintiff had moderate restrictions of daily living, moderate difficulties maintaining social functioning, and moderate difficulties maintaining concentration, persistence or pace.  [R362].  In the Mental Residual Functional Capacity Form, O'Neil determined that Plaintiff was moderately limited in her ability to: understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule; maintain regular attendance; be punctual; complete a normal workday and workweek without interruptions; interact appropriately with the

21

general public; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them; and respond appropriately to changes in a work setting. [R366-67, 370]. O'Neil provided the following RFC: (1) limited persistence, pace, and concentration; (2) limited reliability; (3) ability to do simple and some detailed tasks; (4) limited ability to deal with others and with stress; and (5) ability to handle routine interactions in a low-demand setting for the most part. O'Neil indicated that these were not significant limitations. [R368].

On May 2, 2006, Dr. Tammy Robinson performed a consultative examination, listing Plaintiff's chief complaints as seizures, torn knee cartilage, depression, thyroid disease, arthritis in hands, knees, and lower back, loss of feeling in the right leg, anxiety/panic attacks, right leg and hip pain, back pain, swelling in feet and ankles, and asthma. [R371-81]. At this time, Plaintiff was taking Trileptal (an anticonvulsant), Ziac, Effexor (anti-depressant), Fibercon, Celebrex, and Zoloft. R374]. A review of Plaintiff's symptoms showed that Plaintiff had asthma, chronic constipation, and frequent kidney stones. [R375]. Dr. Robinson noted that Plaintiff weighted 453 pounds at the time of the visit. Dr. Robinson also noted that Plaintiff's back and knee pain were chronic and could not be repaired by surgery due to her obesity. Plaintiff had pain in her right hip and knee and walked with her knee stiff because of the pain.

22

Dr. Robinson noted that Plaintiff could bend, stoop, and sit for long periods.  Plaintiff had normal muscle strength except for the right lower extremity.  Dr. Robinson noted that many of Plaintiff's problems were aggravated or caused by her morbid obesity. [R378].

On May 11, 2006, Dr. John Heard completed a Physical Residual Functional Capacity Assessment.  [R382-89].  Dr. Heard determined that Plaintiff could: (1) occasionally lift 20 pounds; (2) frequently lift 10 pounds; (3) sit, stand, and/or walk for 6 hours in an 8-hour day; (4) push/pull without limitations; (5) frequently climb ramps/stairs, balance, stoop, kneel, crouch, and crawl; and (6) never climb ladders/rope/scaffolds.  [R383-84].  Dr. Heard noted that Plaintiff should avoid all exposure to hazards.  [R386].

On June 26, 2006, Dr. Michael Morrison saw Plaintiff for left knee pain. Dr. Morrison indicated that Plaintiff was "very overweight" and had "massive obesity." Plaintiff's knee range of motion was limited and painful.  An X-ray of the left knee showed joint space narrowing.  Dr. Morrison's plan for Plaintiff was: heat/cold; consider aquatics; and follow up in four weeks.  [R390].

Plaintiff was seen by Dr. Bashuk on June 28, 2006, and she reported having two to three seizures per day.  Dr. Bashuk noted that Plaintiff arrived wheel chair bound and

AO 72A
(Rev.8/8
2)

oxygen dependent.  Plaintiff also complained of headaches, anxiety and neck pain.  Dr. Bashuk diagnosed Plaintiff with morbid obesity and indicated that he could not determine whether she suffered from seizures or pseudoseizures.  [R395].

Plaintiff saw Dr. Ajayi on September 1, 2006.  Plaintiff informed Dr. Ajayi that since her last visit, she had become homeless and her mother had died.  Plaintiff was irritable and had mood swings.  Dr. Ajayi determined that Plaintiff likely was bipolar, had an unsupportive social environment, and was impeded following her mother's death.  [R648].

A note from the Cobb County/Douglas County Community Services Board from November 2006 indicated that Plaintiff was discharged from its services because of her incarceration.  The discharge diagnosis was as follows: (1) major depressive disorder, recurrent, moderate and panic disorder on Axis I; (2) no diagnosis on Axis II; and (3) a GAF score of 35 with a highest past score of 60.  [R644].

A physician's orders form[8] from the Georgia Department of Corrections ("DOC") dated January 12, 2007, provided the following profile of Plaintiff: may wear own soft shoes, no standing, no marching, no work detail, no strenuous exercise, and

_____

[8]     This orders form also lists Plaintiff's medications and consultative exams that she had.  The Court does not summarize these notations unless their relevance is apparent.

24

bottom bunk.  [R531].  A February 1, 2007, DOC health profile indicated that Plaintiff weighed 340 pounds and had the following profile: (1) weakest in upper and lower extremities and in physical capability, stamina; (2) normal in her hearing; (3) intermediate vision; (4) psychiatric disorder; (5) minimal tooth decay; (6) no work under any circumstances; (7) in need of a special program because of her impairments; and (8) in need of assistance for mobility.  [R512].

Plaintiff had an X-ray of her lumbar spine on February 19, 2007.  Dr. Merrill Berman determined that Plaintiff had spondylolisthesis[9] at L3 over L4 and degenerative disc disease[10] at L3-L4.  [R461].  On March 16, 2007, Plaintiff was seen to follow up on her spine x-rays, which had been ordered because of low back pain and right hip pain.  Plaintiff was assessed with low back pain, degenerative disc disease, and morbid obesity.  She was prescribed shoe inserts and the following medications - - Motrin,

_____

[9]     Spondylolisthesis is a condition in which the vertebra begins to shift out of place, sometimes causing the bones to press on nerves.  *See* Spondylolysis and Spondylolisthesis, Am. Acadamy of Orthopaedic Surgeons, http://orthoinfo.aaos.org/ topic.cfm?topic=A00053 (last visited Sept. 17, 2010).

[10]     Degenerative disc disease is not a disease, but a term used to describe the normal changes in a person's spinal discs that occur with aging.  The condition may cause back pain.  *See* Degenerative Disc Disease - Topic Overview, WebMD, http://www.webmd.com/back-pain/tc/degenerative-disc-disease-topic-overview (last visited Sept. 17, 2010).

AO 72A
(Rev.8/8
2)

Robaxin (muscle relaxant), Percogesic (pain reliever).  A routine DOC medical examination indicated that Plaintiff had back, hip, and foot pain.  The physician's assistant assessed Plaintiff with chronic lower back pain and radiculopathy, left heel pain, obesity, and impaired mobility.  [R498].

Plaintiff's profile was reissued on March 16, 2007.  [R529].  The profile initially was the same as the January/February 2007 profiles; however, a doctor altered the profile on March 30 by striking the restrictions against marching, working, and wearing soft shoes.  [R501, 529].  As a result, Plaintiff's profile as of March 30 was as follows: (1) no prolonged standing, but alternating between 10 minutes rest and 20 minutes standing; (2) no strenuous activity; and (3) bottom bunk.  [*Id.*].

On June 4, 2007, Plaintiff was referred to a psychologist for cognitive behavioral therapy regarding grief and depression.  [R527].  Plaintiff's DOC profile for June 8, 2007, was as follows: (1) no prolonged standing; (2) no marching; (3) soft shoes; and (4) no strenuous exercise.  [R527].

On July 17, 2007, Plaintiff was seen by Dr. Lorin Freedman for a seizure disorder at Midtown Neurology.  Plaintiff reported having six seizures in the prior two weeks.  [R614].  Plaintiff reported feeling confused and dizzy from certain seizure medications.  She also reported frequent mood swings and episodes of daytime

26

somnolence.   [R455].   Plaintiff was diagnosed with epilepsy, unspecified, and prescribed Depakote.  Dr. Freedman noted that without outside records, it was difficult to determine whether Plaintiff had seizures or psychogenic issues.  Dr. Freedman also noted that Plaintiff had obstructive sleep apnea given Plaintiff's obesity, daytime somnolence, hypertension, and snoring, for which Dr. Freedman recommended a sleep study.  [R454, 615, 616].  Finally, Dr. Freedman determined that Plaintiff had bipolar affective disorder, moderate depression.  [R454, 616].

On August 6, 2007, Plaintiff had an overnight polysomnography to evaluate her sleep apnea.  At this time Plaintiff weighed 324 pounds with a BMI of 52.4.  During the study, Plaintiff experienced 0 obstructive apneas, 66 hypoapneas, 1 central apneas, and 0 mixed apneas.   [R545-607].   In interpreting the sleep study, Dr. Francis Buda diagnosed Plaintiff with movement disorder of sleep and obstructive sleep apnea with significant oxygen desaturation and recommended sleep medicine and another polysomnography for CPAP titration.  [R546].

Plaintiff's DOC profile was reissued on September 26, 2007, and provided that Plaintiff could not perform strenuous exercise or handle prolonged standing, but she could alternate standing for 30 minutes and taking a break for 10 minutes.  Also, Plaintiff was to wear soft shoes.  [R524].

Plaintiff's DOC profile was renewed on January 2, 2008, and she was prohibited from performing strenuous exercises and standing longer than 20 minutes. She was allowed to wear soft shoes. [R522]. On February 14, 2008, an ultrasound revealed that Plaintiff suffered from cholelithiasis (the production of gallstones). [R447].

On May 13, 2008, Plaintiff was seen by Dr. William Battles. Plaintiff was described as morbidly obese, and she had depressed/dysphoric mood. Plaintiff's judgment was limited and her sleep pattern was poor/irregular. Plaintiff was diagnosed with major depressive disorder and panic with agoraphobia. [R649].

C.     *Evidentiary Hearing Testimony*

At the July 16, 2008, administrative hearing, Plaintiff testified that she was 35 years old, and she had two children, a 14 year old daughter and a 3 year old son. [R671-72]. Plaintiff was 5 feet, 2 inches tall, and she weighed 313 pounds. [R681]. Plaintiff lived with her sister and her sister's son, but her own children lived with other relatives. [R672]. Plaintiff completed tenth grade of high school, and she later earned her GED. [R673]. Plaintiff had last worked for two or three months as a cashier in 2004, but she left that job due to her seizures, which caused Plaintiff to be dizzy and "faze out." [R673].

28

Plaintiff was incarcerated between January 2007 and April 2008 for selling prescription medication.  Plaintiff said she was innocent but took the blame because her mother was on her deathbed.  [R674].  Plaintiff previously had been arrested for drug possession and identity fraud.  [R674-75].  Plaintiff indicated that she did not attempt to find work between incarcerations because she had seizures three or four times per week, which varied in length between two and ten minutes.  [R675].  At the time of the hearing, Plaintiff stated that she had seizures two or three times per week, which caused her to phase out and feel dizzy and weak.  [R676].

After waking up, Plaintiff's day typically involved dressing and performing certain chores like laundry.  When Plaintiff's medications "kick[ed] in," she would become drowsy and take a nap.  [R678].  The medications usually kicked in 45 minutes after taking them, and the medications also caused Plaintiff to become dizzy, confused and lose coordination.  [R682].  When Plaintiff's sister arrived home, Plaintiff would help prepare food.  If Plaintiff's son visited, Plaintiff played with him and taught him colors, shapes, and numbers.  Plaintiff rarely saw her daughter.  Plaintiff tried to go to church once per month.  She did not drive because she did not have a license.  [R679].  If Plaintiff needed to get around, she relied on her family or her sister to arrange for something.  [R680].

29

Plaintiff could sit comfortably for 10 to 15 minutes before having to move because she felt like she needed to do something and her legs would get numb. [R680]. Throughout the day, Plaintiff tried to alternate sitting and standing. Plaintiff could lift 7 to 10 pounds, and she could hardly lift her son who was 27 pounds. [R681].

The vocational expert ("VE") testified that a hypothetical individual with the following characteristics could perform work as a spice mixer (light and unskilled), a checker (light and unskilled), and a produce weigher (light and unskilled): (1) ability to perform light work; (2) required a sit/stand option; (3) ability to occasionally perform postural activities; (4) inability to climb ropes or ladders; (4) inability to be around hazards; (5) ability to perform simple work with occasional interaction with other employees, supervisors, and the public; and (6) the same age, education, and work history of Plaintiff. [R684].

The VE testified that an individual with the above six characteristics and whose daily medications caused severe side effects, which precluded her from paying attention for 45 minutes to 2 hours in a day, would not be able to work. [R685].

## III. ALJ'S FINDINGS OF FACT

The ALJ made the following findings of fact and conclusions of law:

1.   The claimant met the insured status requirements of the Social Security Act through June 30, 2001.

2.   The claimant has not engaged in substantial gainful activity since January 31, 1996, the alleged onset date (20 CFR 404.1520(b), 404.1571 *et seq.*, 416.920(b) and 416.971 *et seq.*).

3.   The claimant has the following severe impairments: chronic lumbar strain; seizure disorder, major depressive disorder and morbid obesity (20 CFR 404.1520(c) and 416.920(c)).

4.   The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

. . .

5.   After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(c) with the following limitations and abilities: requires a sit/stand option; simple work and occasional interaction with other employees, public and supervisors; no hazards; can never climb ladders, ropes and scaffolds and can occasionally perform postural activities.

. . .

6.   The claimant is unable to perform any past relevant work  (20 CFR 404.1565 and 416.965).

31

. . .

7.    The claimant was born on March 20, 1973 and was 23 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.    The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966).

. . .

11.   The claimant has not been under a disability, as defined in the Social Security Act, from January 31, 1996 through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

[R17-23].

32

The ALJ explained that at Step 3, Plaintiff did not meet or medically equal Listing 12.06 because she only had "moderate," not marked, (1) restrictions of activities of daily living, (2) difficulties in maintaining social functioning, and (3) difficulties in maintaining concentration, persistence or pace.  [R18].

The ALJ determined that Plaintiff had the RFC to perform light work with the following limitations: need for sit/stand option; simple work with only occasional interaction with other employees, the public, and supervisors; no hazards; no ladders, ropes, and scaffolds; and occasional postural activities.  [*Id.*].  Below this finding, the ALJ summarized the following evidence: (1) Plaintiff's administrative hearing testimony; (2) Plaintiff's daily activities; (3) the medical records from Dr. Sharon Tuckett; (4) the evaluation of Dr. Charles Scott; (4) the evaluation of Dr. Clark Robinson; (5) records from Dr. Robert Bashuk, including a list of medications; (6) records from the Georgia DOC between January 2007 and April 2008; (7) the psychological evaluations of Dr. Rebecca Blakeman in 2004 and 2006; (8) medical records from the Douglas County Community Service Board, including a list of medications; and (9) records from the Cobb County Community Service Board.  [R19-20].

33

After reviewing this evidence, the ALJ indicated that Plaintiff's impairments could produce the alleged symptoms, but she determined that Plaintiff was not credible to the extent that the symptoms were inconsistent with the RFC. [R20-21]. The ALJ determined that Plaintiff's seizures were not frequent or severe enough to prevent Plaintiff from performing her usual daily activities. The ALJ indicated that any discomfort that Plaintiff experienced did not prevent her from moving and using her arms, legs, and hands in a satisfactory manner. The ALJ found that Plaintiff could alternate between sitting and standing and that she could lift up to 30 pounds, albeit with difficulty. As for Plaintiff's depression, the ALJ determined that it did not prevent Plaintiff from thinking, communicating, and acting in her own interests. [R21]. The ALJ found that Plaintiff's obesity was a factor in her difficulties with walking and standing and caused greater limitations than if Plaintiff were not obese. [R21]. Finally, the ALJ concluded that the evidence received after the state agency opinions indicated that Plaintiff was more limited than originally thought. [R21].

The ALJ found that with Plaintiff's RFC, Plaintiff could not perform her past relevant work. [R21-22]. However, the ALJ determined that Plaintiff could perform other work such as a spice mixer/food preparer, checker, and produce weigher based on the vocational expert's testimony. [R22-23].

34

## IV.   STANDARD FOR DETERMINING DISABILITY

An individual is considered disabled for purposes of disability benefits if he is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."   42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).   The impairment or impairments must result from anatomical, psychological, or physiological abnormalities which are demonstrable by medically accepted clinical or laboratory diagnostic techniques and must be of such severity that the claimant is not only unable to do previous work but cannot, considering age, education, and work experience, engage in any other kind of substantial gainful work that exists in the national economy. 42 U.S.C. §§ 423(d)(2)-(3), 1382c(a)(3)(B), (D).

The burden of proof in a Social Security disability case is divided between the claimant and the Commissioner.   The claimant bears the primary burden of establishing the existence of a "disability" and therefore entitlement to disability benefits. *See* 20 C.F.R. §§ 404.1512(a), 416.912(a).   The Commissioner uses a five-step sequential process to determine whether the claimant has met the burden of proving disability.   *See* 20 C.F.R. §§ 404.1520(a), 416.920(a); *Doughty v. Apfel*, 245 F.3d 1274,

AO 72A
(Rev.8/8
2)

1278 (11th Cir. 2001); *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999). The claimant must prove at step one that he is not undertaking substantial gainful activity. *See* 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). At step two, the claimant must prove that he is suffering from a severe impairment or combination of impairments, which significantly limits his ability to perform basic work-related activities. *See* 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). At step three, if the impairment meets one of the listed impairments in Appendix 1 to Subpart P of Part 404 (Listing of Impairments), the claimant will be considered disabled without consideration of age, education and work experience. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). At step four, if the claimant is unable to prove the existence of a listed impairment, he must prove that the impairment prevents performance of past relevant work. *See* 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). At step five, the regulations direct the Commissioner to consider the claimant's residual functional capacity, age, education and past work experience to determine whether the claimant can perform other work besides past relevant work. *See* 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). The Commissioner must produce evidence that there is other work available in the national economy that the claimant has the capacity to perform. To be considered disabled, the claimant must

36

prove an inability to perform the jobs that the Commissioner lists. *Doughty*, 245 F.3d at 1278 n.2.

If at any step in the sequence a claimant can be found disabled or not disabled, the sequential evaluation ceases and further inquiry ends. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). Despite the shifting of burdens at step five, the overall burden rests on the claimant to prove that he is unable to engage in any substantial gainful activity that exists in the national economy. *Doughty*, 245 F.3d at 1278 n.2; *Boyd v. Heckler*, 704 F.2d 1207, 1209 (11th Cir. 1983).

## V.    SCOPE OF JUDICIAL REVIEW

A limited scope of judicial review applies to a denial of Social Security benefits by the Commissioner. Judicial review of the administrative decision addresses three questions: (1) whether the proper legal standards were applied; (2) whether there was substantial evidence to support the findings of fact; and (3) whether the findings of fact resolved the crucial issues. *Fields v. Harris*, 498 F. Supp. 478, 488 (N.D. Ga. 1980). This Court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner. If substantial evidence supports the Commissioner's factual findings and the Commissioner applies the proper legal standards, the Commissioner's findings are conclusive. *Lewis v. Callahan*, 125 F.3d

AO 72A
(Rev.8/8
2)

1436, 1439-40 (11th Cir. 1997); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987); *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986); *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983).

"Substantial evidence" means more than a scintilla, but less than a preponderance.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion and it must be enough to justify a refusal to direct a verdict were the case before a jury.  *Richardson v. Perales*, 402 U.S. 389 (1971); *Hillsman*, 804 F.2d at 1180; *Bloodsworth*, 703 F.2d at 1239.  "In determining whether substantial evidence exists, [the Court] must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [Commissioner's] decision." *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986).  Even where there is substantial evidence to the contrary of the ALJ's findings, the ALJ decision will not be overturned where "there is substantially supportive evidence" of the ALJ's decision.  *Barron v. Sullivan*, 924 F.2d 227, 230 (11th Cir. 1991).  In contrast, review of the ALJ's application of legal principles is plenary.  *Foote v. Chater*, 67 F.3d 1553, 1558 (11th Cir. 1995); *Walker*, 826 F.2d at 999.

38

## VI.   CLAIMS OF ERROR

Plaintiff argues that the ALJ committed the following four errors: (1) the ALJ failed to weigh or properly evaluate the opinion from the Georgia Department of Corrections; (2) the ALJ failed to evaluate the side effects of Plaintiff's medications; (3) the ALJ failed to evaluate Plaintiff's sleep apnea, degenerative disc disease and spondylolisthesis; and (4) the ALJ failed to evaluate properly the opinions of state agency psychologists.  [*See* Doc. 15 at 1].  The Court discusses these claimed errors below albeit in a different order than the one presented by Plaintiff.

### A.   *Side Effects of Plaintiff's Medications*

Plaintiff contends that the ALJ erred by failing to account for the side effects of her medications, which she reported as making her dizzy, sleepy, tired, and confused. [Doc. 15 at 17].  The Commissioner responds that although Plaintiff's testimony and self-completed administrative forms documented side effects from medications, the medical record is devoid of complaints of side effects relating to sleepiness or drowsiness.  [*Id.* at 8-9].  The Commissioner faults Plaintiff for failing to produce medical evidence that she suffered from these side effects.  He also asserts that the ALJ noted Plaintiff's complaints but ultimately found that the symptoms were not credible to the extent that they were inconsistent with the RFC.  [*Id.* at 10].

39

Plaintiff replies that because the VE testified that the side effects would preclude all work, the ALJ should have evaluated them. [Doc. 17 at 5]. Plaintiff asserts that the ALJ's general credibility finding is insufficient in this case because it did not address Plaintiff's somnolence. [*Id.*]. Finally, Plaintiff notes that the Commissioner raised the following post-hoc rationalizations: (1) Plaintiff did not request a change in medication; (2) the medical evidence did not demonstrate that Plaintiff suffered from drowsiness; and (3) Plaintiff did not identify the medications that made her drowsy. [*Id.* at 5-7].

"It is conceivable that the side effects of medication could render a claimant disabled or at least contribute to a disability." *Cowart v. Schweiker*, 662 F.2d 731, 737 (11th Cir. 1981). As a result, an ALJ considers side effects from medications when evaluating an individual's credibility about symptoms. *See* 20 C.F.R. §§ 404.1529(c)(3)(iv), 416.929.(c)(3)(iv); SSR 96-7p. Also, an ALJ considers side effects in determining a claimant's RFC. *See* SSR 96-8p ("The RFC assessment must be based on all of the relevant evidence in the case record, such as: . . . restrictions imposed by the mechanics of treatment (e.g., . . . side effects of medication[.]"). "[W]hen there is evidence in the record that the claimant is taking medications, and it is conceivable that the "side effects of medication could render a claimant disabled or at least contribute to a disability," the ALJ has an obligation to elicit testimony or make

40

findings on the effects of the medications on the ability to work[.]" *Leiter v. Comm'r of Soc. Sec. Admin.*, No. 09-15293, 2010 WL 1794177 at *5 (11th Cir. May 6, 2010) (quoting *Cowart*, 622 F.2d at 737).

The Court concludes that the ALJ did not err in her treatment of Plaintiff's medication side effects. Plaintiff contends that the ALJ ignored medication side effects of sleepiness, confusion, dizziness, and fatigue. The ALJ's opinion, however, noted that Plaintiff testified about her medication making her extremely drowsy, [R19], and that Plaintiff was taking medications for her impairments, [R20]. The ALJ then stated that:

> After considering the evidence of record, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the [RFC] assessment.

[R20]. Under Eleventh Circuit precedent, the ALJ's citation to side effects and medications along with a finding that the evidence was considered and that the limitations were not credible to the extent they were inconsistent with the RFC appears to suffice. *See Lipscomb v. Comm'r of Social Sec.*, 199 Fed. Appx. 903, 906 (11th Cir. Oct. 17, 2006) (rejecting argument that ALJ failed to consider side effects where ALJ

41

generally noted side effects but determined that claimant's testimony did not support

limitations greater than those determined in the ALJ decision); *cf. Jones v. Dep't of*

*Health and Human Servs.*, 941 F.2d 1529, 1533 (11th Cir. 1991) (rejecting argument

that ALJ failed to consider the combined effect of pain and side effects where ALJ

indicated that considered combination of impairments).[11]

_____

[11]     The Commissioner also argued that the ALJ's rejection of side effects was
proper because the medical records did not indicate that Plaintiff complained to her
medical providers that sleepiness was a side effect. [Doc. 16 at 10-11]. The absence
of complaints of side effects in the medical records is substantial evidence to support
a finding that side effects were not disabling. *See Swindle v. Sullivan*, 914 F.2d 222,
226 (11th Cir. 1990) (holding that substantial evidence supported ALJ's determination
that side effects did not present a significant problem because "the record did not
disclose any concerns about side effects by the several doctors who examined and
treated" claimant); *French v. Massanari*, 152 F. Supp. 2d 1329, 1338 (M.D. Fla. 2001)
(finding no error in considering claimant's side effects where there was a "notable
absence in [claimant's] medical records of any complaints by [claimant] about side
effects of his medications" and there was no indication that "that any of the many
doctors that examined and treated French was concerned about the potential side effects
of his medications"); *Holley v. Chater*, 931 F. Supp. 2d 840, 850 (S.D. Fla. 1996)
(stating that claimant's hearing testimony of drowsiness and dizziness as side effects
without any other evidence was insufficient to support a disability determination);
*Crumpton v. Shalala*, 881 F. Supp. 547, 552-53 (N.D. Ala. 1994) (finding no error in
application of the pain standard where there was no evidence in the record that Plaintiff
complained of a side effect to his doctor). The Court's review of the medical record
found two complaints of side effects in the medical record: (1) on July 17, 2007,
plaintiff reported feeling confused and dizzy from certain seizure medications, [R455];
and (2) on January 23, 1998, Plaintiff complained of occasional dizziness or shakiness
on Neurontin, [R426]. Thus, the Commissioner would be correct had the ALJ made a
finding about the absence of complaints of side effects in the medical record. However,
the ALJ did not make such a finding, so the Court concludes that it is improper to

42

Accordingly, the Court concludes that the ALJ **DID NOT ERR** in evaluating Plaintiff's side effects.

*B. State Agency Psychologists*

Plaintiff argues that the ALJ failed to explain why she determined that Plaintiff had less severe mental limitations than those found by the non-examining state agency psychologists. [Doc. 15 at 19-21]. Plaintiff asserts that the ALJ's limitations of simple work and occasional interaction with others were less severe than the psychologists' findings of 'moderate' mental limitations in such work-related areas as performing activities within a schedule, maintaining regular attendance, being punctual, and

---

affirm the ALJ's decision on the Commissioner's post hoc rationalization. *See Jackson ex rel. K.J. v. Astrue*, --- F. Supp. 2d ----, ----, 2010 WL 3258571 at *15 (N.D. Ga. Aug. 16, 2010) (citing *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962); *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)). Also, it is inappropriate for the Court to supply "a reasoned basis for [an] agency's action that the agency itself has not given." *See Dixon v. Astrue*, 312 Fed. Appx 226, 229 (11th Cir. 2009) (quoting *Zahnd v. Sec'y Dep't of Agr.*, 479 F.3d 767, 773 (11th Cir. 2007)); *Byrum v. Office of Personnel Mgmt.*, --- F.3d ----, ----, 2010 WL 3504761, *8 (Fed. Cir. Sept. 9, 2010) ("However, we will not invent administrative decisions that were not issued by the responsible administrative authority."). Although the Eleventh Circuit condones general statements by the ALJ, and the Court finds substantial evidence to support the ALJ's conclusion on this issue based on this precedent and an independent review of the record, the Court notes that it would be inappropriate to attribute all the reasoning to the ALJ which the Commissioner's brief attempts to do. Thus, the Court sets forth the standard concerning post hoc rationalizations.

AO 72A (Rev.8/82)

completing a normal work day.  [*Id.* at 20].  Plaintiff contends that the ALJ's failure to state reasons for rejecting this evidence requires remand.  [*Id.* at 21].

The Commissioner argues that Plaintiff's argument is both factually and legally incorrect.  [Doc. 16 at 14].  First, the Commissioner argues that the findings of moderate limitations in the Psychiatric Review Technique Form ("PRTF") are used at Steps 2 and 3 by the Commissioner, so the ALJ was not required to incorporate these into the RFC.  [*Id.* at 17].  Second, the Commissioner argues that the ALJ incorporated mental limitations in the RFC as demonstrated by the limitations of simple work and occasional interaction with others.  [*Id.* at 17-18].  Third, the Commissioner contends that the findings of moderate limitations on section I of the Mental Residual Functional Capacity ("MRFC") form are not RFC findings but merely worksheet notes pursuant to the Commissioner's Program Operations Manual System ("POMS") 24510.060.B.2.  The Commissioner asserts that the findings in section III of the MRFC form constitute the RFC under POMS.  [*Id.* at 18-19].  Fourth, the Commissioner asserts that the ALJ considered the psychologists' opinions by discussing them and finding Plaintiff more limited.  [*Id.* at 20].

Plaintiff asserts that the Commissioner's distinctions between the PRTF and MRFC forms are distractions and the limitations in these forms are relevant to the

44

RFC.  [Doc. 17 at 10].  Plaintiff notes that the limitations in the ability to perform

within a schedule, maintain regular attendance, and complete a workday/workweek

without interruptions  were not accounted for in the ALJ's RFC.  [*Id.* at 10-11].

The Commissioner evaluates every medical opinion that is received regardless

of the source.  20 C.F.R. §§ 404.1527(d), 416.927(d).  Evidence from nonexamining

sources is considered opinion evidence, so the ALJ must considers these opinions as

well.  20 C.F.R. §§ 404.1527(f)(2)(i), 416.927(f)(2)(i).  In evaluating these opinions,

the ALJ considers the physician's or psychologist's medical specialty and expertise in

the rules, the supporting evidence, the supporting explanations, and other relevant

factors.  *Id.* §§ 404.1527(f)(2)(ii), 416.927(f)(2)(ii).

The Court concludes that the ALJ did not adequately evaluate the state agency

psychologists opinions.  The Court need not resolve the dispute between the parties

concerning the PRTF, Part I of the MRFC form, and Part III of the MRFC form because

the Court agrees with Plaintiff that the ALJ did not explain why she omitted certain

limitations in the RFC.  Plaintiff has essentially complained that the ALJ did not

evaluate the opinions relating to Plaintiff's ability to maintain a schedule, maintain

regular attendance and be punctual.  [*See* Doc. 15 at 20].  Both Telford-Tyler and

O'Neil indicated on Part I of the MRFC form that Plaintiff had moderate limitations in

45

these areas.  [*See* R243, 366].  They then incorporated these findings in Part III of the MRFC form by determining that Plaintiff would have episodic interruptions in a normal workweek, [R245 (Telford-Tyler)], or that Plaintiff had limited reliability, [R368 (O'Neil)].  Thus, Plaintiff's argument implicates Part III of the MRFC form, so the Court need not examine whether the omission of Part I findings is error given that the Part I findings were incorporated at Part III of the MRFC form.  As a result, the Court side steps the distinctions between Part I and Part III of the MRFC form and examines whether the ALJ properly considered the state agency psychologists' findings relating to reliability and interruptions in the workweek at Part III of the MRFC form (which appear to be derived from findings in Part I of the MRFC form relating to moderate limitations in punctuality and maintaining a schedule).

The Court concludes that the ALJ erred in evaluating the opinions of the state agency psychologists because the ALJ did not explain why she omitted the limitations relating to Plaintiff's reliability and episodic interruptions of the workweek.  The Commissioner appears to argue that there was no error because the non-examining psychologists determined that the limitations in reliability and maintaining a workweek were not "substantial limitations."  [*See* Doc. 16 at 16].  This argument is not persuasive because the ALJ included other limitations in her RFC that the non-

46

examining psychologists determined to be non-substantial limitations. The ALJ's RFC mirrored other facets of the non-examining psychologists' findings by limiting Plaintiff to simple work and limiting her interactions with people. [*Compare* R18 (ALJ) *with* R245 (Telford-Tyler), R368 (O'Neil)]. Both Telford-Tyler and O'Neil appear to have determined that these limitations were not substantial limitations in their RFC findings. [*See* R245, 368]. As a result, it is not enough for the Commissioner to suggest that the ALJ could omit these limitations from her RFC simply because the state agency psychologists determined that they were not substantial limitations given the ALJ's adoption of other non-substantial limitations in the RFC.

The Commissioner also argues that the state agency psychologists' mental limitations were incorporated in the ALJ's RFC. [Doc. 16 at 17-18]. This argument is only partially correct because the ALJ said nothing about Plaintiff's limitations regarding reliability and interruptions in the work week. [*See* R20]. The ALJ did not explain why she did not credit the non-examining psychologists' limitations about limited reliability and interruptions in the workweek. These limitations from the non-examining psychologists should have been evaluated. *See* 20 C.F.R. §§ 404.1527(d), 416.927(d). The ALJ's statement that she considered these opinions without more is insufficient in this instance, especially since the ALJ indicated that Plaintiff was "more

47

limited than was originally thought" by the non-examining sources. [R21]. It is not clear why the ALJ omitted limitations relating to Plaintiff's reliability and ability to maintain a work week as found by the state agency psychologists.

Finally, the Court notes that the record evidence supports the state agency psychologists' opinions about Plaintiff's reliability and inability to work a week without episodic interruptions. First, in October 2004, the consulting psychologist, Blakeman, indicated that Plaintiff's anxiety would impede, *inter alia*, Plaintiff's ability to show up for work and persevere under stress. [*See* R236-37]. Second, Blakeman provided a similar opinion in March 2006 when she found that Plaintiff would have significant difficulties maintaining employment since her anxiety would impede attendance. [*See* R319]. Third, reports from the Community Service Board indicated that Plaintiff's psychological impairments were interfering with her functioning. [R321, 324-25, 648]. The Court concludes that the ALJ should have explained why she did not credit the limitations relating to reliability and interruptions in the workweek given the psychologists' findings, the ALJ's statement about Plaintiff having greater limitations than those found by the state agency experts, and the record evidence supporting the psychologists' opinions.

48

Accordingly, the Court concludes that the ALJ **ERRED** in failing to evaluate the state agency psychologists' opinions relating to Plaintiff's reliability and ability to work without interruptions.

C.      *Georgia Department of Corrections*

Plaintiff argues that the ALJ erred by not giving great weight to the finding of the Georgia Department of Corrections ("DOC") that Plaintiff could not perform work under any circumstances.   [Doc. 15 at 15-16].   The Commissioner responds that Plaintiff's reliance on the DOC's February 2, 2007, finding is not a determination of an administrative agency in that it was a one-page form and was reassessed regularly such that the DOC lifted the work restrictions.   [Doc. 16 at 5-8].   The Commissioner contends that given the subsequent reevaluation in the work profile, the DOC health profile did not constitute a disability fining and fell short of the 12-month duration requirement.   [*Id.* at 8].

Plaintiff replies that the Commissioner's arguments in his brief invite the Court to allow the Commissioner's counsel to perform a post-hoc rationalization of the ALJ's decision.   [Doc. 17 at 1].   As for the Commissioner's reliance on the *Dyer v. Barnhart*, 395 F.3d 1206 (11th Cir. 2005), decision, Plaintiff asserts that it is distinguishable in that it does not require the ALJ to discuss or evaluate non-material evidence.   [*Id.* at 1-

49

2].  Third, Plaintiff notes that the Commissioner's arguments relating to the DOC findings do not demonstrate that Plaintiff was not disabled and were post hoc rationalizations.  [*Id.* at 3-4].

A state agency finding of disability is not binding on the Commissioner.  *See* 20 C.F.R. §§ 404.1504, 416.904 ("A decision by . . . any [ ] governmental agency about whether you are disabled . . . is not binding on [the Commissioner].").  Although not binding, these disability decisions "cannot be ignored and must be considered." SSR 06-03p.  In the Eleventh Circuit, courts not only require the ALJ to consider the agency's disability determination, but also that the determination be "entitled to great weight." *Rodriguez v. Schweiker*, 640 F.2d 682, 686 (5th Cir. Mar. 25, 1981)[12] (citing *Epps v. Harris*, 624 F.2d 1267, 1274 (5th Cir. 1980), and *DePaepe v. Richardson*, 464 F.2d 92, 94 (5th Cir. 1972)).  When the ALJ fails to explicitly weigh a state agency finding, the ALJ's decision will not be in error if the context of the decision indicates that the ALJ implicitly made a finding about an agency's disability finding.  *See Kemp v. Astrue*, 308 Fed. Appx. 423, 426 (11th Cir. 2009) (concluding that ALJ's reference to VA rating and reliance on VA records indicated that he implicitly determined that

_____

[12]     In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*), the Eleventh Circuit adopted as binding precedent all of the decisions of the former Fifth Circuit rendered prior to the close of business on September 30, 1981.

50

the VA ratings were entitled to great weight) (citing *Hutchison v. Bowen*, 787 F.2d 1461, 1463 (11th Cir. 1986)).

The Court concludes that the ALJ erred in failing to explicitly evaluate or consider the Department of Corrections no work detail finding.  In reaching this conclusion, the Court first resolves the parties' argument as to whether the Department of Corrections no work detail finding constituted a finding of disability by a state agency.  [*Compare* Doc. 15 at 15-16 (arguing there was error where agency disability determination was not considered) *with* Doc. 16 at 6 (maintaining that the health profile was not an agency determination of disability)].  The applicable regulations do not explicitly define what constitutes a state agency disability finding.  *See* 20 C.F.R. §§ 404.1504, 416.904 (merely noting that state agency findings are not binding).  The Social Security Rulings also do not provide a definition, but Social Security Ruling 06-03p offers examples of governmental agency disability findings by identifying workers' compensation findings and Department of Veterans Affairs findings. *See* SSR 06-3p. The cases in the Eleventh Circuit are similarly silent defining what constitutes a state agency disability finding, but they have identified the following types of agency findings as falling within state agency disability findings: VA disability

51

determinations[13]; findings by a state's retirement division[14]; findings by the United

States Office of Personnel Management for disability retirement[15]; and a state's

worker's compensation findings.[16]

Although the Social Security Rulings and court decisions in the Eleventh Circuit

have not identified prison work detail findings as being disability findings, the Court

concludes that the DOC findings constitute state agency disability findings after

reviewing the DOC regulations.  Under the Georgia Administrative Code, inmates are

afforded an opportunity to work because "work assignments are an integral part of the

overall rehabilitative program."  Ga. Comp. R. & Regs. § 125-3-5-.02.  Able-bodied

inmates are "required to work eight (8) hours per day (except Saturdays, Sundays, and

legal holidays) on a regular job assignment," so the standard work week for inmates

---

[13]     *Rodriguez v. Schweiker*, 640 F.2d 682, 686 (5th Cir. Mar. 25, 1981); *see also Pearson v. Astrue*, 271 Fed. Appx. 979, 980-81 (11th Cir. Apr. 1, 2008)

[14]     *Bloodsworth v. Heckler*, 703 F.2d 1233, 1241 (11th Cir. 1983)

[15]     *Lampp v. Astrue*, No. 3:07-cv-93, 2008 WL 906641, *11 (M.D. Fla. Mar. 31, 2008).

[16]     *Falcon v. Heckler*, 732 F.2d 827, 831 (11th Cir. 1984) ("Because the two disability definitions [under Florida worker's compensation laws and the Social Security Act] actually are construed in a like manner, the ALJ erred in not giving great weight to the Florida agency's finding of temporary total disability[.]")

52

consists of 40 hours.  *Id.* § 125-3-5-.06(1), (2).  Before assigning an inmate to work,

DOC staff must:

> evaluate properly each newly arrived inmate as to his (her) work capability and capacity prior to his (her) assignment to a work detail. Work classification factors shall include, but not be limited to, consideration of all available data concerning the inmate's physical and mental condition, attitude, security rating, the nature of his (her) crime, the length of his (her) sentence, his (her) treatment plan, and his (her) personal preference if job options for which he (she) is eligible are available at the institution.  The inmate's work assignment shall be determined by the data developed, including a personal interview, and shall be circumscribed as directed by the institutional physician based on the inmate's medical condition.  Any inmate . . . who has been seriously ill or injured shall be examined by the institutional physician and evaluated as to whether or not he (she) is physically qualified for assignment or reassignment to a work detail.

*Id.* § 125-3-5-.01.  Thus, a no work detail finding by the Georgia DOC is a

determination that an inmate cannot perform 8-hours of work per day or 40-hours of

work per week, *i.e.*, the DOC's no work detail finding constitutes a disability finding.

Based on these regulations, the Court concludes that the DOC's no work detail

finding involving Plaintiff was a determination based on its work classification factors

that Plaintiff could not work for 8 hours per day and 40 hours per week.  In other

words, the DOC finding constituted a finding of disability by a state agency because

the DOC determined that Plaintiff could not work a normal workday or workweek.  As

AO 72A
(Rev.8/8
2)

a result, the ALJ should have considered this DOC finding, *see* SSR 06-03p, and should have determined whether this decision was entitled to be given great weight, *see Parrish v. Comm'r of Soc. Sec. Admin.*, 334 Fed. Appx. 200, 201 (11th Cir. June 9, 2009).

The ALJ did not explain her consideration of this no work status finding. Although the ALJ was aware of the DOC records, the extent of her discussion of these records was as follows:

> Records from the Georgia [DOC] covering a period of January 2007 through April 2008 document the claimant's treatment for various complaints while incarcerated.  The record shows that she received treatment for complaints of seizures, morbid obesity, hypertension, asthma and fibromyalgia.  The records include diagnoses of low back pain secondary to degenerative disc disease, epilepsy and seizures, left leg numbness, morbid obesity and sleep apnea.

[R20].  This discussion does not mention or evaluate the Georgia DOC's no work status findings from January 12, February 1, and March 16, 2007.  [R512, 529, 531].  In reviewing the DOC determination, the ALJ "should explain the consideration given to" the DOC's no work status finding.  *See* SSR 06-03p.   As such, the ALJ's failure to evaluate the DOC's no work findings was error under the Commissioner's Social Security Ruling 06-03p and the Eleventh Circuit case law.

54

The Court concludes that Plaintiff has persuasively argued that this error requires reversal.   Initially, the Court agrees with the Commissioner's position that the subsequent removal of the no work restriction, [*see* R501, 522, 524, 529], undermines Plaintiff's argument.   The DOC regulations indicate that inmates work for 8 hours per day and 40 hours per week.   *See* Ga. Comp. R. & Regs. § 125-3-5-.06(1), (2).   As a result, the removal of the no work status restriction suggests that the DOC found that Plaintiff could work a normal work week given these regulations, which contradict Plaintiff's assertion that the lifting of the restriction does not necessarily demonstrate that Plaintiff could perform work for 8 hours per day and 40 hours per week, [*see* Doc. 17 at 3].

Although the Court is not persuaded by Plaintiff's arguments about the subsequent lifting of the no work restrictions, the Court is persuaded by Plaintiff's argument that the no work restriction appears consistent with the evidence that preceded the DOC determination.   The medical record in 2006 contains evidence that Plaintiff would not be able to work.   First, Blakeman determined Plaintiff would have significant difficulties obtaining and maintaining gainful employment because her attendance, ability to concentrate, and ability to perform job duties would be impeded and she would likely struggle with production norms and have problems interacting

55

with co-workers.  [R319].  Second, Plaintiff was assessed with a GAF of 35 on March 2, 2006. [R324].  Third, Dr. Ajayi determined that Plaintiff's concentration was impaired and her attention shifted.  [R321].  Fourth, on June 28, Plaintiff was wheel-chair bound and oxygen dependent.  [R395].  Given these reported problems all of which appear to have some bearing on Plaintiff's ability to work, the Court finds that the Commissioner must explain the relationship of these records to the the January and February DOC no work findings.  As a result, the undersigned concludes that it was error for the ALJ to fail to consider whether the DOC no work finding was entitled to great weight.

Accordingly, the Court concludes that the ALJ **ERRED** in failing to consider the Georgia Department of Corrections' findings in January, February, and March 2007 restricting Plaintiff from working.

D.      *Evaluation of Plaintiff's Medical Impairments*

Plaintiff argues that the ALJ failed to consider Plaintiff's sleep apnea, which Plaintiff asserts could have accounted for or contributed to her daytime somnolence. [Doc. 15 at 17].  Plaintiff notes that despite the evidence of sleep apnea, the ALJ never accounted for it in crafting the RFC or in considering Plaintiff's medication side effects.  [*Id.* at 18].  Plaintiff also argues that the ALJ failed to explain

56

what effects Plaintiff's degenerative disc disease diagnosis had on her functional abilities.  [*Id.* at 19].  Plaintiff also states that the ALJ failed to even mention the diagnosis of spondylolisthesis.  [*Id.*].

The Commissioner responds that the ALJ properly accounted for Plaintiff's daytime sleepiness in that the ALJ recorded this limitation in the decision.  [Doc. 16 at 11].  The Commissioner next argues that Plaintiff failed to demonstrate that the sleep apnea caused functional limitations.  [*Id.* at 11-12].  He next contends that the ALJ's decision indicates that he considered the evidence because the ALJ stated that she considered all symptoms and opinion evidence but found no evidence that they met or equaled the Listings.  [*Id.* at 12].  As for Plaintiff's degenerative disc disease, the Commissioner notes that a mere diagnosis of DDD is not sufficient to establish severity and that the ALJ discussed and accounted for Plaintiff's back pain as demonstrated by the postural limitations and sit/stand option.  [*Id.* at 13-14].

Plaintiff replies that the ALJ's generic statement that she considered the entire record is insufficient to demonstrate that she considered sleep apnea.  [*Id.* at 7].  Plaintiff next contends that the Commissioner's other arguments relating to sleep apnea are post hoc rationalizations.  [*Id.* at 7-8].  Plaintiff also asserts that the Commissioner has made post-hoc rationalizations concerning spondylolisthesis and degenerative disc

57

disease because the ALJ made no findings as to these two impairments.  [*Id.* at 8, 9].

Plaintiff also notes that she is not contending that these two impairments demonstrate

that she met a Listing.  [*Id.* at 9].

> In cases where a claimant has multiple impairments, the regulations state:
>
> In determining whether your physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under the law, we will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity.  If we do find a medically severe combination of impairments, the combined impact of the impairments will be considered throughout the disability determination process. . . .

20 C.F.R. §§ 404.1523, 416.923.  Thus, the ALJ must consider all of a claimant's

impairments in making a disability determination.  *See id.*; *Sneed v. Barnhart*,

214 Fed. Appx. 883, 887 (11th Cir. Dec. 22, 2006) (citing *Jones*, 941 F.2d at 1533).

Although the ALJ must consider all impairments, the ALJ is not required to refer to

every piece of evidence in the record.  *Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir.

2005); *Hutchison*, 787 F.2d at 1463 (stating that the ALJ need not "mechanically recite

the evidence leading to her determination").  A court cannot affirm, however, the

Commissioner's final decision if "it is impossible for a reviewing court to determine

whether the ultimate decision on the merits of the claim is rational and supported by

58

substantial evidence." *Luckey v. Astrue*, 331 Fed. Appx. 634, 639 (11th Cir. 2009) (quoting *Cowart*, 662 F.2d at 735); *Dyer*, 395 F.3d at 1211 (quoting *Foote*, 67 F.3d at 1561) ("[T]he ALJ's decision [cannot be] . . . a broad rejection which is 'not enough to enable [the reviewing courts] to conclude that [the ALJ] considered [the claimant's] medical condition as a whole.' ").

The Court concludes that in light of the other errors in the ALJ decision, the Commissioner should reevaluate Plaintiff's impairments of sleep apnea, degenerative disc disease, and spondylolisthesis on remand. The ALJ's opinion does not explicitly refer to spondylolisthesis, but the opinion notes that Plaintiff had a diagnosis of sleep apnea[17] and "low back pain secondary to degenerative disc disease" while she was at the Georgia DOC. [*See* R20]. The ALJ also found limitations based on Plaintiff's back pain and indicated that she "consider[ed] the evidence of record." [R20]. Although

_____

[17]    The Commissioner has faulted Plaintiff for not identifying limitations stemming from these impairments. Although this argument may have some validity (20 C.F.R. §§ 404.1512, 416.912), the undersigned notes that Plaintiff's sleep apnea, spondylolisthesis, and DDD were all diagnosed after Plaintiff was referred to specialists by the DOC. [*See* R461, 545-46]. Under the DOC regulations, such referrals are made when "[a]n inmate within a state institution [ ] develops an illness or sustains an injury which requires medical care that is unavailable at the institution." Ga Comp. R. & Regs. § 125-4-4.09(a), (b). That the DOC opted to obtain medical opinions outside of the State prison, which led to the diagnoses, suggests that she had limitations stemming from these impairments.

these considerations may suggest that the ALJ adequately evaluated Plaintiff's impairments, the Court will not definitively resolve this issue since the case must be remanded on other grounds.  Instead, the Commissioner should re-examine Plaintiff's impairments of sleep apnea, degenerative disc disease, and spondylolisthesis along with Plaintiff's other medically determinable impairments on remand.

**VIII.  CONCLUSION**

For the aforementioned reasons, the Court **REVERSES** the final decision of the Commissioner and **REMANDS** the case for further proceedings consistent with this opinion.  The Clerk is **DIRECTED** to enter final judgment in Plaintiff's favor.

**IT IS SO ORDERED and DIRECTED,** this the 20th day of September, 2010.

**ALAN J. BAVERMAN**
**UNITED STATES MAGISTRATE JUDGE**

AO 72A
(Rev.8/8
2)